# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01027-SCT

*MARLON LATODD HOWELL a.k.a. MARLON COX*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/17/2013 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM ODOM RICHARDSON |
| | MATTHEW H. RICHARDSON |
| | RACHEL PIERCE WAIDE |
| | W. TUCKER CARRINGTON |
| | WILLIAM M. MCINTOSH, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JIM HOOD |
| | JASON L. DAVIS |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | AFFIRMED - 10/09/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., PIERCE AND COLEMAN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     Marlon Howell was convicted of capital murder and sentenced to death. On direct appeal, we affirmed. ***Howell v. State***, 860 So. 2d 704 (Miss. 2003). Howell then sought post-conviction relief (PCR), claiming he was entitled to a new trial. The Court granted Howell's petition for PCR in part, holding that he was entitled to an evidentiary hearing on certain delineated issues. ***Howell v. State***, 989 So. 2d 372 (Miss. 2008) ("***Howell II***"). The

trial court held the evidentiary hearing and, finding no merit in the issues, denied Howell's request for a new trial. Howell appeals.

## Facts and Procedural History

¶2. The instant case has been before the Court twice before, and the facts are well established. The facts were set out in full in the opinion on direct appeal. *Howell*, 860 So. 2d at 712-15 (¶¶ 2-19). The following facts are taken from *Howell II*, which discussed only the facts relevant to the PCR:

> In the early morning hours of May 15, 2000, Hugh David Pernell, a newspaper carrier, was shot and killed in his car on Broad Street in New Albany while running his newspaper route. The shooting occurred in front of Charles Rice's house. Rice would later tell law enforcement that he had heard two cars on the street in front of his house at around five o'clock in the morning. He looked out his window and saw two vehicles, one behind the other, stopped in the street. A man exited the rear car and approached the driver's side window of the front vehicle. After some commotion, the man pulled a pistol and shot the driver of the front vehicle. The shooter then got back in the passenger seat of the rear vehicle and left the scene. Pernell suffered a single gunshot wound to the chest and died at the scene. Rice immediately called 911 and reported the shooting and later told law enforcement officers that the shooter was a young black male who had fled the scene in a late model, dark-colored Oldsmobile.
>
> Law enforcement officers received an anonymous tip that Curtis Lipsey was involved in the murder. The investigation revealed that Lipsey, Adam Ray, and Marlon Howell had been riding around together throughout the previous night and the early morning hours of the day of the shooting. Ray's grandmother owned a dark Oldsmobile Cutlass. Upon questioning, Ray and Lipsey implicated Howell. Howell was arrested and claimed that he had no involvement in the murder. Howell told officers that he had been in Corinth with a woman at the time of the killing; however, he was unable to provide a name or an address for this woman. After Howell's arrest, Rice identified Howell in a police line-up.
>
> A Lorcin .380 caliber pistol was found in the bushes behind Brandon Shaw's house. Forensic testing indicated that the bullet that killed Pernell was fired by this Lorcin pistol. A shell casing found near the windshield of Pernell's car was consistent with that weapon but could not be positively matched.

2

Shaw testified that Howell, Ray, and Lipsey had come to his house in the dark Oldsmobile Cutlass in the early morning hours after the shooting. Shaw and Lipsey testified that they had seen Howell with an object wrapped in a shirt under his arm. Shaw and Lipsey testified that they had seen Howell walking out from behind the house where the pistol was later found. Shaw told the police chief that he had seen Howell go behind the house carrying something. While at Shaw's house, Adam Ray told Shaw and others that "Marlon had shot somebody." The trial court found that the statement by Ray in Howell's presence amounted to an adoptive admission when Howell did not renounce the statement. After the shooting, Howell got a ride to Blue Mountain with Shaw, and during the drive, Howell told Shaw not to tell anyone what had happened.

The State alleged that Howell had killed Pernell in a robbery attempt. Marcus Powell testified that Howell had told him on the night of the killing that he needed money to pay his probation officer and that he was going to have to "make a sting" in order to get the money. Shaw also testified that Howell had commented on robbing a man at a gas station earlier that night.

Ray and Lipsey pleaded guilty to manslaughter and armed robbery in the killing of Pernell. As part of his plea agreement, Lipsey was to offer truthful testimony at any subsequent trial related to Pernell's killing. At Howell's trial, Lipsey testified that Howell had shot Pernell, and Lipsey also corroborated Powell's testimony that Howell had said that he needed money in order to pay his probation officer the next day or else they would not see him around anymore. Lipsey also testified that Howell had flashed the car's lights at Pernell to get Pernell to pull over.

At his trial, Howell presented an alibi defense by offering as witnesses his father and sister, who testified that Howell had been at home in the early morning hours of May 15, 2000. Howell presented no evidence that during the relevant time surrounding Pernell's killing, he had been with a woman in Corinth.

*Howell II*, 989 So. 2d at 377-78 (¶¶ 2-10). Howell was convicted of capital murder for killing Pernell during an attempted robbery, and he was sentenced to death. The Court affirmed the conviction and sentence on direct appeal. *Howell*, 860 So. 2d at 765 (¶ 216).

The United States Supreme Court granted Howell's petition for certiorari, but later dismissed it as improvidently granted because Howell had not properly raised a claim arising under federal law in state court. *Howell v. Mississippi*, 543 U.S. 440 (2005).

¶3.     In 2008, Howell filed a petition for post-conviction relief, which was granted in part. The Court held that Howell was entitled to an evidentiary hearing on three specific areas: (1) claims regarding Charles Rice's recanted testimony; (2) issues related to Howell's representation or lack thereof at the lineup; and (3) issues related to Terkecia Pannell's alleged exculpatory statements. *Howell II*, 989 So. 2d at 396 (¶ 90). The evidentiary hearing took place in April 2013. The trial judge found no merit in Howell's claims and denied his request for a new trial. Howell now appeals.

¶4.     Howell raises two issues in addition to the three areas that were the subject of the hearing. First, he claims that the trial court erred in allowing Attorney General Jim Hood to participate in the evidentiary hearing. Hood was the district attorney who prosecuted Howell, and he chose to participate in the evidentiary hearing. Part of Howell's claim about Pannell is that the State's attorney intimidated her and did not let her testify at trial. Although it is not clear to whom Pannell spoke, Howell claims it was Hood. Howell also asserts that Hood tried to intimidate his attorneys during the evidentiary hearing. Howell moved to have Hood barred from participating in the hearing, but the judge denied the request. Howell claims that was error.

¶5.     Second, after the evidentiary hearing, new information came to light that Howell asked the trial court to consider. A woman from South Carolina, who used to live in Blue Mountain, Mississippi, read about Howell's case on the Tupelo Daily Journal's website and

4

came forward claiming she was with Howell on the night of the murder. The woman was interviewed, and she and her mother submitted affidavits about Howell's whereabouts the night/morning of the murder. Howell claims she is the previously unnamed woman he claimed to be with on the night of the murder, which supports his original alibi. Howell moved to supplement the record, but the trial court denied the motion for lack of jurisdiction. Howell raises the denial of his motion to supplement the record on appeal as well.

## Standard of Review

¶6.     At an evidentiary hearing on PCR, the burden of proof is on the petitioner to prove "by a preponderance of the evidence that he is entitled to the relief." Miss. Code Ann. § 99-39-23(7) (Supp. 2014). The standard of review on appeal from a trial court's evidentiary hearing in a PCR case is as follows:

> "When reviewing a lower court's decision to deny a petition for post[-]conviction relief this Court will not disturb the trial court's factual findings unless they are found to be clearly erroneous." *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999) (citing *Bank of Mississippi v. Southern Mem'l Park, Inc.*, 677 So. 2d 186, 191 (Miss. 1996)) . . . . In making that determination, "[t]his Court must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact . . . .' " *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987) (quoting *Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss. 1983)). That includes deference to the circuit judge as the "sole authority for determining credibility of the witnesses." *Mullins*, 515 So. 2d at 1189 (citing *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963)).

*Goodin v. State*, 102 So. 3d 1102, 1111 (¶ 30) (Miss. 2012) (quoting *Doss v. State*, 19 So. 3d 690, 694 (¶ 5) (Miss. 2009)). "[Q]uestions of law are reviewed de novo." *Id.*

## Discussion

¶7.     The purpose of the evidentiary hearing was to address Howell's claims in three areas: (1) Rice's alleged recanted testimony, (2) Howell's representation at the lineup, and (3) Pannell's alleged exculpatory statements. *Howell II*, 989 So. 2d at 396 (¶ 90). The trial judge found no merit in Howell's claims, and Howell raises the issues on appeal. Also before the Court is Howell's claim that the trial court erred in allowing Attorney General Hood to participate in the hearing and his claim that the trial court erred in denying his motion to supplement the record with affidavits from new alibi witnesses.

**I.   Whether Howell is entitled to relief based on Charles Rice's alleged recanted testimony.**

¶8.     The shooting occurred outside Charles Rice's home. Rice looked out the window when he heard a car horn and witnessed the shooting. Rice identified Howell as the shooter in a lineup held the day after the shooting. He testified at trial and identified Howell in court. Howell submitted an affidavit signed by Rice in 2005, which stated that Rice had doubts about whether Howell was the shooter and that he recanted his identification of Howell. Rice signed another affidavit in 2007, reaffirming his identification of Howell and his trial testimony. In the 2007 affidavit, Rice said he had been pressured to sign the 2005 affidavit, he signed it so that the investigator would leave him alone, and he did not know the legal significance of the document when he signed it. Both affidavits were before the Court in *Howell II*. In light of the contradictory affidavits, the Court held that Howell was entitled to a post-conviction hearing on the issue of whether Rice had recanted his testimony. The Court wrote:

> In the direct appeal of Howell's capital-murder conviction and death sentence, we held that Rice's identification of Howell was reliable and that the jury was

6

entitled to weigh the credibility of the evidence. ***Howell***, 860 So. 2d at 731. Unquestionably, Rice's testimony was crucial to the State's case. The State admitted as much in closing argument when the prosecutor stated that the State could have rested after Rice testified. After reviewing Rice's trial testimony, the 2005 affidavit in which he partially recanted his identification of Howell, and the 2007 affidavit in which he reaffirmed his trial testimony, we find that Howell has shown that he is entitled to a post-conviction hearing on this issue. This issue can be resolved by the trial judge, who will have an opportunity not only to hear Rice's testimony, but also to observe Rice's demeanor as Rice is subjected to both direct examination and cross-examination. This also is certainly true of other witnesses who might testify on this issue.

***Howell II***, 989 So. 2d at 384 (¶ 34).

¶9.     Rice signed another statement in 2013, which was put into evidence at the evidentiary hearing, reaffirming that his testimony at trial was truthful and saying that he was willing to take a lie detector test.  At the evidentiary hearing, Rice testified that the 2005 affidavit – in which he expressed doubts about his identification of Howell as the shooter – was not true. He said investigators came to his house the day before his wedding, and he signed the statement to get them out of his house.  He testified that he has no doubts about his identification of Howell, and he is 100 percent certain that he accurately identified Howell. Rice reaffirmed his trial testimony – he said it was still his testimony that "Marlon Howell shot Mr. Pernell" – and he maintained that he correctly identified Howell in the lineup.

¶10.    In ***Howell II***, although granting Howell's PCR on the issue, the Court gave the law regarding recanted testimony:

> As a general rule, recanted testimony is "exceedingly unreliable, and is regarded with suspicion; and it is the right and duty of the court to deny a new trial where it is not satisfied that such testimony is true." ***Bradley v. State***, 214 So. 2d 815, 817 (Miss. 1968). Further, "[e]xperience teaches all courts a healthy skepticism toward recanted testimony. . . ." ***Yarborough v. State***, 514 So. 2d 1215, 1220 (Miss. 1987). The fact that a witness changes his testimony after the trial does not necessarily entitle the petitioner to a new trial. ***Russell***

7

***v. State***, 849 So. 2d 95, 107 (Miss. 2003) (citing ***Peeples v. State***, 218 So. 2d 436, 438 (Miss. 1969); ***Williams v. State***, 669 So. 2d 44, 53 (Miss. 1996)).

***Howell II***, 989 So. 2d at 384 (¶ 33). When a defendant moves for a new trial based on recanted testimony, the defendant has "the burden of proving two elements to the satisfaction of the trial judge at the evidentiary hearing: (1) he must have sufficiently proven the perjury existed by showing that the recantation was material, and (2) he must have proven the result of a new trial would be different than the one reached." ***Walls v. State***, 735 So. 2d 1010, 1011 (¶ 3) (Miss. 1999) (citing ***Williams v. State***, 669 So. 2d 44, 54 (Miss. 1996)).

¶11. The trial judge heard Rice's testimony at the evidentiary hearing and concluded that Rice's 2005 affidavit recanting his testimony was unreliable. Although Rice admittedly lied when he executed the 2005 affidavit, the trial judge found that Rice's testimony at the hearing was credible and that his identification and trial testimony were reliable. The trial judge found no merit in the claim regarding Rice's recanted testimony. Because Rice reaffirmed his trial testimony and his identification of Howell, there is no indication that the result of a new trial would be different. Thus, Howell has not satisfied the two elements required to justify a new trial based on recanted testimony. *See **Walls***, 735 So. 2d at 1011 (¶ 3).

¶12. The trial judge is responsible for reviewing "all of the circumstances of the case, 'including the testimony of the witnesses submitted on the motion for the new trial'" and the Court "will not overturn a decision to grant or deny a motion for new trial based on recanted testimony unless the circuit judge abused his discretion." ***Russell v. State***, 849 So. 2d 95, 107 (¶ 15) (Miss. 2003) (quoting ***Bradley v. State***, 214 So. 2d 815, 817 (Miss. 1968)). After

8

reviewing the transcript of Rice's testimony and his affidavits, we hold that the trial judge did not err in finding that Rice's testimony at the hearing and at trial was credible and that the 2005 affidavit was unreliable.

**II. Whether Howell is entitled to relief based on Terkecia Pannell's alleged exculpatory statements.**

¶13.    Terkecia Pannell was Brandon Shaw's girlfriend at the time of the murder. She was at Shaw's house the day and night before the murder. Howell's co-defendants, Curtis Lipsey and Adam Ray, were Shaw's close friends, but Pannell met Howell for the first time the night before the murder. Lipsey, Ray, and Howell were hanging out at Shaw's house prior to the murder, and the trio also allegedly returned to Shaw's house afterwards. Pannell and Shaw were asleep when the trio returned. Shaw got out of bed and talked with the others, then he drove Howell home. Pannell remained in the bedroom; she did not speak with Lipsey, Ray, or Howell when they returned that morning.

¶14.    Pannell gave a statement to police during the investigation. She told police that Shaw told her that "Marlon had shot a white guy." When she asked Shaw why Howell did it, Shaw said Howell had tried to rob the man and ended up shooting him. Shaw told Pannell that he agreed to drive Howell home because Howell had a gun and he was afraid Howell would kill him. Pannell's version of the events and conversations that occurred the morning of the murder, after the trio returned to Shaw's house, came entirely from her conversations with Shaw. She did not have personal knowledge, because she remained in the bedroom.

¶15.    Pannell was subpoenaed to testify at Howell's trial, but she was not called as a witness. Pannell claims that, while they were waiting in the witness room, she told Shaw that

9

she was not going to lie. She then went into the hall and told the district attorney that she was not going to lie. Pannell could not identify the attorney she spoke to, but she claims he told her she was not needed and sent her home. Tonya Peterson testified at the evidentiary hearing. Peterson testified that she was at the courthouse for Howell's trial, and she heard a black girl telling two men in suits that she was not going to lie. Howell claims that Peterson's testimony corroborated Pannell's story about speaking to the attorneys in the hallway.

¶16. In 2006, Pannell executed an affidavit "to provide information as to Marlon Howell's innocence." She wrote that Lipsey and Ray had shot someone, not Howell, and that Howell did not return to Shaw's house with them that morning. She said Lipsey and Ray came back with a gun, but she did not see Howell with a gun. Pannell wrote that she would have testified to the above-described version of events at trial and that she wanted to testify, but she was not called. The affidavit provided that Pannell did not read her original statement to police before signing it; the police wrote out the statement, and she did not know what it said. She claimed that she told police and the district attorney the same information and that her story had always been the same; she did not know how the police came up with the version of events that they wrote down as her initial statement. However, at the hearing, she testified that she did read the original statement before signing it, and she "probably lied" and "probably gave false information to try to protect" Shaw because he was on probation at the time. Pannell, now an ordained minister, did not attempt to provide the alleged exculpatory evidence on her own. Instead, she provided the affidavit to investigators after they sought her out.

10

¶17.    Howell claims that the State did not call Pannell because her testimony would have inculpated Lipsey and Ray. He claims that the State committed a *Brady* violation by withholding material, exculpatory evidence.[1] He asserted in his PCR that his trial counsel was ineffective for failing to interview Pannell, but he did not raise that issue in his brief. Pannell was questioned at length at the evidentiary hearing, and her story changed constantly. The trial judge found that the entirety of Pannell's testimony was hearsay and/or irrelevant, so it would not have been admissible at trial. Thus, the trial attorneys were not ineffective for failing to interview her. After Pannell was questioned about her affidavit, the judge found that, other than her name and age, nearly the entirety of her testimony was not credible.[2] The judge concluded that Pannell had "no credibility" with the court, her testimony had "no validity," and if she were allowed to testify at a new trial her testimony would be "highly suspect" because she had admitted to lying under oath. The trial judge held that the issues related to Pannell's testimony were without merit.

¶18.    The United States Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Court has adopted a four-pronged test for establishing a *Brady* violation:

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] On cross-examination at the evidentiary hearing, counsel went through each line of Pannell's affidavit and highlighted each item that Pannell said actually might not be true or that she could not confirm. The judge questioned Pannell as well, and she admitted that she was drinking and smoking marijuana the night of the murder.

11

> To establish a *Brady* violation a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995) (citations omitted). Howell cannot prove each element of the *Brady* violation test because, as the trial judge held, Pannell's testimony was hearsay, irrelevant, and unreliable. Likely, none of Pannell's testimony would have been admissible at trial; thus, there is not a reasonable probability that the outcome of the trial would have been different had the prosecution made the defense aware of her statements.

¶19. As discussed above, the trial judge is responsible for reviewing and evaluating "the testimony of the witnesses submitted on the motion for the new trial," and the Court "will not overturn a decision to grant or deny a motion for new trial based on recanted testimony unless the circuit judge abused his discretion." *Russell*, 849 So. 2d at 107 (¶ 15). After reviewing the record, transcript, and affidavits related to Pannell's testimony, we conclude that the trial judge correctly characterized Pannell's testimony as unreliable and entirely lacking in credibility. The trial judge did not abuse his discretion in finding the issues related to Pannell's testimony to be without merit.

**III. Whether Howell is entitled to a new trial because he was not able to present his defense at trial in regard to his lack of representation at the lineup.**

¶20. The trial judge concluded that Howell was not represented by counsel at the lineup. The judge seemingly reached a harmless error conclusion on Howell's lack of representation claims, holding that there was no impropriety or suggestiveness concerning the lineup – that

12

issue was ruled on by the Court in *Howell I* – so the presence of counsel would not have mattered. Howell raises multiple issues related to his lack of representation at the lineup.

¶21. Howell's first issue is that he is entitled to a new trial because he was not able to present his defense at trial regarding lack of representation during the lineup. He presents three arguments under the issue: (1) the Sixth Amendment Confrontation Clause has been violated and his conviction and sentence should be vacated; (2) the State lied about counsel being present at the lineup, which denied him his due process right to present a complete defense; and (3) he is entitled to a new trial because the State's misrepresentations amounted to a violation of *Napue v. Illinois*.[3] The State did not respond.

### A. Confrontation Clause

¶22. Howell claims that his conviction and sentence should be vacated because the Sixth Amendment Confrontation Clause was violated. He asserts that, had counsel known at trial that no attorney was present at the lineup, questioning of Rice "would have revealed the complete unreliability of his identification of Howell." Because Howell was not told the truth about representation at the lineup, he claims he was not given a "full and fair opportunity to probe and expose these infirmities through cross-examination," which was a violation of the Confrontation Clause.

¶23. The Sixth Amendment Confrontation Clause provides that the accused has the right "to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. *See also* Miss. Const. art. 3 § 26. Under the Confrontation Clause, "the admission of a testimonial statement

---

[3] *Napue v. Illinois*, 360 U.S. 264 (1959).

13

of a witness who does not appear at trial is barred, unless that witness is unavailable, and the defendant has had a prior opportunity for cross-examination." ***Corbin v. State***, 74 So. 3d 333, 338 (¶ 13) (Miss. 2011) (citing ***Davis v. Washington***, 547 U.S. 813, 821 (2006)). The Supreme Court has held that a testimonial statement is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." ***Crawford v. Washington***, 541 U.S. 36, 59 (2004). The instant issue does not evoke the Confrontation Clause. Rice was available to testify. His testimonial statement was that he saw Howell shoot Pernell. Howell was able to "confront" Rice about his testimonial statements through cross-examination.

¶24. The Sixth Amendment does not give the accused the right to cross-examine every witness on every possible subject, as some topics may be barred as irrelevant or statements may be objected to as hearsay. Rice testified at trial about the crime that he witnessed, the individual he saw, and his identification of Howell in the lineup. Whether an attorney was present during the lineup would not affect what Rice saw or the certainty of his identification. Rice was emphatic about the certainty of his identification at trial and at the evidentiary hearing. Howell makes only general allegations; he does not provide anything specific about how the presence of an attorney at the lineup would have dampened Rice's credibility or how it would have been relevant to Rice's testimony.

¶25. Potential Confrontation Clause violations are reviewed for harmless error. ***Conners v. State***, 92 So. 3d 676, 684 (¶ 20) (Miss. 2012). Because the Court has held that the lineup was proper, Rice was certain about his identification, and Rice would not be the proper witness to testify about the presence of an attorney at the lineup, Howell's inability to cross-

14

examine Rice about the presence of an attorney at the lineup was harmless error, if it was error at all.

## B. Due Process Right to Present a Complete Defense

¶26.    Howell maintains that the State's misrepresentations about counsel being present at the lineup denied him the due process right to present a complete defense. He claims that the State's case hinged on a single piece of evidence – Rice's identification. Howell argues that, because the jury assumed an attorney was at the lineup, the jury had no reason to believe the lineup was not proper. Thus, Howell claims that he was denied the opportunity to put on a complete defense because, had he known counsel was not present at the lineup, he would have used that to impeach Rice's identification "with the actual presumptive unfairness of not having an attorney present." Howell does not cite any authority for the argument.

¶27.    Again, it is not clear how the lack of an attorney at the lineup would discredit Rice's testimony. There was ample testimony from Rice and others about the lineup. *See Howell*, 860 So. 2d at 728-29 (¶¶ 82-86). The Court has held that the lineup was not unduly suggestive and that Rice's identification was reliable. *Id.* at 731 (¶ 92); *Howell II*, 989 So. 2d at 381 (¶ 24). As discussed above, the lack of an attorney at the lineup is not sufficient to impeach Rice's testimony because the lineup was proper, Rice was certain about his identification, and Rice would not be the proper witness to testify about the presence of an attorney at the lineup.

## C. Violation of *Napue v. Illinois*

¶28. Finally, Howell claims that he is entitled to a new trial because the State's misrepresentations amounted to a violation of *Napue v. Illinois*. In that case, the Supreme Court held:

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.
>
> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citations omitted). Howell writes that a *Napue* violation occurs when a prosecuting attorney knows that a witness's testimony is false and does nothing to correct it.

¶29. Howell maintains that Police Chief David Grisham lied about the presence of counsel at the lineup and that "the State has, at the very least, stood by as Grisham made these statements repeatedly." He asserts that the State "had every indication that Grisham's statements were false." Grisham testified at the evidentiary hearing that he could have been mistaken but that he did not lie to the court when he said that Russell was present at the lineup. At the time of the hearing, Grisham still believed that Russell was there. Howell did not present any evidence that Grisham intentionally lied or that the State knew that an attorney was not present at the lineup. The issue is without merit.

**IV. Whether Howell is entitled to a new trial because he was denied his right to counsel at the lineup.**

16

¶30. Howell claims that he is entitled to a new trial because he was denied the right to counsel at the lineup. When Howell was named as a suspect in Pernell's murder, police arrested him on an outstanding warrant for a parole violation. A lineup was held the next morning, and Rice identified Howell. After the lineup, Howell was charged with capital murder. Howell argues that he was under arrest for capital murder at the time of the lineup, so the right to counsel had attached. According to the State, the right to counsel had not attached because Howell was not under arrest for capital murder when the lineup took place. The State maintains that the right to counsel is "offense specific," meaning it attaches only to the offense for which adversarial judicial proceedings have commenced. In the alternative, the State posits that, if Howell was entitled to counsel at the lineup, the violation was harmless error. The trial court agreed with the State, holding that Howell was being held on a probation violation and suspicion of capital murder, but he was not under arrest for capital murder when the lineup took place.

¶31. At the evidentiary hearing, officers explained that Howell had an outstanding warrant for a parole violation, so they used that warrant to arrest him when he became a suspect in the shooting on May 15, 2000. Chief Grisham and Investigator Tim Kent both testified that Howell was not under arrest for capital murder when the lineup was conducted the following morning and that they did not get the warrant for capital murder until after the lineup. Likewise, Mickey Baker from the Mississippi Bureau of Investigation testified that Howell was charged with capital murder after the lineup on May 16, 2000. Kent said they did not charge Howell with capital murder initially because he was not comfortable with the amount

17

of evidence they had at that time – being only the statements of two co-conspirators – so he wanted to see if the witness identified Howell in a lineup before proceeding with charges.

¶32.    Several exhibits were introduced at the hearing pertaining to Howell's arrest on May 15, 2000 – arrest forms, a booking sheet, and Kent's report – which indicated that Howell was booked on both capital murder and the parole violation on May 15.  Kent's initial narrative attached to his report referred to Howell being taken to the detention center "where he was booked on capital murder."  When questioned about the documents, Kent explained that they did not want Howell to get out on the parole violation before they had a chance to conduct the lineup.  Kent said "being booked and being charged are two different things." He testified that, in his mind, Howell was not charged with capital murder at that time; he was being held on the parole violation warrant and suspicion of capital murder.  However, Kent testified that, even if Howell had bonded out on the parole violation, he would not have been able to leave.  Kent said he did not tell Howell that he was being charged with capital murder on the night of May 15.  He testified that Howell likely was first served with the warrant for capital murder around noon the day of the lineup, which took place around 10:00 that morning.  The date on the warrant for capital murder is May 16, 2000.

¶33.    "The Sixth Amendment right to counsel is 'offense' specific and does not attach until prosecution begins." *Weeks v. State*, 804 So. 2d 980, 995 (¶ 55) (Miss. 2001) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 174-77 (1991)).  In *McNeil*, the United States Supreme Court explained, "The purpose of the Sixth Amendment counsel guarantee – and hence the purpose of invoking it – is to protect the unaided layman at critical confrontations with his expert adversary, the government, *after* the adverse positions of government and defendant have

18

solidified with respect to a particular alleged crime." *McNeil*, 501 U.S. at 177-78 (internal quotations omitted). Thus, the Sixth Amendment right to counsel attaches once the government has initiated charges "with respect to a particular alleged crime." *Id. See also Neal v. State*, 57 So. 3d 1271, 1279 (Miss. 2011) (defendant was in custody on felony escape charge; Sixth Amendment right to counsel did not extended to burglary charge); *Mack v. State*, 650 So. 2d 1289, 1316 (Miss. 1994) (defendant's invocation of Sixth Amendment right to counsel on burglary charge did not extend to capital murder charge).

¶34. In *Weeks v. State*, Weeks was being held on a firearms charge on March 16, 1997, when he gave a statement to police confessing to murder. *Weeks*, 804 So. 2d at 995 (¶ 52). Weeks was charged with murder two weeks later on March 31. *Id.* at 996 (¶ 57). The Court held that Weeks's right to counsel as to the murder charge had not attached when he confessed on March 16. *Id.* Weeks had gone to the sheriff's office as early as February 26 and told officers that "it was his fault" that the victim was missing. *Id.* at 985 (¶ 3). Other evidence also linked Weeks to the victim's disappearance. *Id.* at 985-86 (¶¶ 3-4). Thus, like the case at hand, law enforcement officers had reason to suspect that Weeks was involved in the murder prior to his being charged, yet the Court still held that Weeks's right to counsel on the murder charge had not attached when he was under arrest for possession of a firearm and made an incriminating statement to police.

¶35. The right to counsel attaches at the "accusatory stage." *Id.* at 995 (¶ 54). The *Weeks* Court wrote:

> This Court has held that "under both the United States and the Mississippi constitutions, an accused is entitled to be assisted by counsel during criminal proceedings against him." *Ormond v. State*, 599 So. 2d 951, 956 (Miss. 1992).

19

*See* U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890). The only difference between the two is the time of attachment. *Id.* In Mississippi the Sixth Amendment right attaches at the "accusatory stage." *Id.* (citing ***Williamson v. State***, 512 So. 2d 868, 876 (Miss. 1987)). "However, the defendant must be able to show some adverse effect or prejudice to his ability to conduct his defense before denial of this right to counsel constitutes reversible error." *Id.*

*Weeks*, 804 So. 2d at 995 (¶ 54). In ***Page v. State***, the Court further explained the rule, as well as the departure from federal law.

> Once proceedings against a defendant reach the accusatory stage, a right to counsel attaches. ***Cannaday v. State***, 455 So. 2d 713, 722 (Miss. 1984). For purposes of our state constitutional right to counsel, we define the advent of the accusatory stage by reference to state law. Miss. Code Ann. [§] 99-1-7 (1972) provides for commencement of prosecution as occurring when a warrant is issued as well as "by binding over or recognizing the offender to compel his appearance to answer the offense[."] *See **Atkinson v. State***, 132 Miss. 377, 96 So. 310, 311-12 (1923); ***State v. Hughes***, 96 Miss. 581, 585-86, 51 So. 464 (1910). It would be totally irrational to suggest that one "bound over" to await the action of the next grand jury had not been accused. Similarly, law enforcement officials have no authority to deny reasonable access to counsel by one arrested, charged, and advised that his release may be secured upon $25,000.00 bond.
>
> If it has not already attached, the right to counsel is surely available to the accused at the time the Initial Appearance under Rule 1.04, Unif. Crim. R. Cir. Ct. Prac., *ought to have been held,* the "initial appearance[,"] of course, being that of the accused before a judicial officer "without unnecessary delay" following arrest. *See also,* Miss. Code Ann. § 99-3-17 (Supp. 1985). Without engaging in nice calculations regarding the precise moment of conception, we hesitate little in holding that the right to counsel has attached to one such as Ricky Page who has been arrested, has been released on bond, and has in fact secured the services of counsel.[5]
>
>> [FN 5] We are very much aware of the fact that a number of recent federal cases have held that the right to counsel secured by the Sixth Amendment to the Constitution of the United States is available only after the initiation of judicial criminal proceeding, i.e., indictment and arraignment. ***Michigan v. Jackson***, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986); ***United States v. Gouveia***, 467 U.S. 180, 104 S. Ct. 2292, 81 L. Ed. 2d 146, 154 (1984).

> Application of this approach to our state constitutional right to counsel would be wholly unworkable. With grand juries meeting infrequently in many of our rural counties, such an approach would have the right to counsel available to the accused only after many months had passed following arrest. We also take note of the practice in many of our counties of postponing arraignment in order to avoid the impact of our 270 day rule. Miss. Code Ann. § 99-17-1 (Supp. 1985). Adherence to the recently stated federal approach to the right to counsel would, simply put, have the effect of providing that the accused had the right to counsel only after it could be said with reasonable certainty that it would no longer do him any good, i.e., after the point where any competent law enforcement officer would long since have obtained a confession or other inculpatory statement. For these reasons we reject the federal approach and for purposes of today's decision rely exclusively upon state law.

*Page v. State*, 495 So. 2d 436, 439-40 (Miss. 1986). *See also* ***Cannaday v. State***, 455 So. 2d 713, 722 (Miss. 1984) (under Mississippi Code Section 99-1-7, prosecution commences with "the issuance of a warrant, or by binding over or recognizing the offender to compel his appearance to answer the offense, as well as by indictment or affidavit.").

¶36.   The Court has held that an accused has the right to counsel at all "critical stages" after he is in custody. ***Brooks v. State***, 903 So. 2d 691, 694-95 (¶ 7) (Miss. 2005) (quoting ***Coleman v. State***, 592 So. 2d 517, 520 (Miss. 1991)). Undoubtedly, a lineup is a critical stage. ***Jimpson v. State***, 532 So. 2d 985, 989 (Miss. 1988). The key, however, is whether adversarial proceedings have been initiated against the accused when the lineup takes place. "A participant in a lineup has a constitutional right to have a lawyer present if the lineup is held after adversarial proceedings had been initiated against him." ***Brooks***, 903 So. 2d at 694 (¶ 6) (citing ***Jimpson***, 532 So. 2d at 988; ***York v. State***, 413 So. 2d 1372, 1383 (Miss. 1982)). In ***Brooks***, the Court held that adversarial proceedings had commenced because an arrest warrant had been issued, Brooks had been extradited from another state, and Brooks had

21

indicated that he did not want to speak to law enforcement officials. ***Brooks***, 903 So. 2d at 695 (¶ 8).

¶37. Although an accused has a right to counsel at a lineup once adversarial proceedings have commenced, neither we nor the United States Supreme Court has recognized the right to counsel at pre-indictment lineups. *See **Wilson v. State***, 451 So. 2d 718, 722 (Miss. 1984) ("This Court has held consistently that the right to counsel does not extend to preindictment lineups.") (collecting cases); ***Gentry v. State***, 338 So. 2d 1229, 1232 (Miss. 1976) ("[T]he constitutional right to counsel does not attach to a pre-indictment show-up performed for the purpose of including or ruling out a suspect as a possible perpetrator of a recent criminal act, provided that the show-up is not so unduly suggestive as to taint it."); ***Hobson v. State***, 285 So. 2d 464, 466 (Miss. 1973) (citing ***Kirby v. Illinois***, 406 U.S. 682 (1972)).

> The right to counsel at a lineup proceeding as held in ***United States v. Wade***, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), was thereafter specifically limited to a post-indictment situation in which a lineup is held after the formal initiation of judicial criminal proceedings. ***Kirby v. Illinois***, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972). This Court has adopted the rule of ***Kirby*** and held that the right to counsel does not apply to pre-indictment lineups. ***Howard v. State***, Miss., 319 So. 2d 219 (1975); ***Hobson v. State***, 285 So. 2d 464 (Miss. 1973); ***Allen v. State***, 274 So. 2d 136 (Miss. 1973); ***Chandler v. State***, 272 So. 2d 641 (Miss. 1973).

***Cox v. State***, 326 So. 2d 794, 794-95 (Miss. 1976). "In ***Kirby v. Illinois*** . . . , the Court made it clear that the right to counsel attaches only 'at or after the initiation of adversary judicial criminal proceedings, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" ***Bankston v. State***, 391 So. 2d 1005, 1007 (Miss. 1980) (quoting ***Kirby v. Illinois***, 406 U.S. 682, 689 (1972)).

22

¶38. The Court has held that "[a]dversarial proceedings are held to have been initiated when a defendant is arrested pursuant to a warrant." *Lattimore v. State*, 958 So. 2d 192, 198 (¶ 11) (Miss. 2007) (citing *Brooks*, 903 So. 2d at 694 and *Nicholson v. State*, 523 So. 2d 68, 74 (Miss. 1988)). In *Lattimore*, the lineup was held eight days after the defendant had been arrested pursuant to a warrant; thus, the defendant's right to counsel had attached and failure to have counsel at the lineup was error. *Lattimore*, 958 So. 2d at 198 (¶ 12). However, the Court held that the error was "not fatal" to the case because the witness's "in-court identification was based upon her view of the defendant at the scene of the crime and not based upon the lineup." *Id.* at 198 (¶ 13).

¶39. In *Jimpson*, the Court held that adversarial proceedings had commenced where Jimpson had been arrested pursuant to an arrest warrant, he had been given his *Miranda* warning, and he had signed a waiver. *Jimpson*, 532 So. 2d at 988. However, although adversarial proceedings had begun and Jimpson had been subject to a lineup without counsel present, the Court held that the denial of right to counsel at the lineup was harmless error. *Id.* at 989. The Court held that the witnesses' identification of Jimpson was based on their close proximity to him during the crime and, in addition, the evidence in support of the conviction was overwhelming. *Id.*

¶40. In *Magee v. State*, the Court held that "[a]t the time of the lineup Magee was in custody in the sense that he was not free to leave." *Magee v. State*, 542 So. 2d 228, 233 (Miss. 1989). Although Magee was entitled to counsel at that point and his right to counsel was violated, it was harmless error because the witness did not identify Magee at the lineup. *Id.* Unlike the witness in *Magee*, Rice identified Howell in the lineup. But, like the

23

witnesses in *Jimpson* and *Lattimore*, Rice was confident in his identification, testifying that he had ample time to see the shooter at the time of the crime. Testimony from Rice and the officers involved in the lineup make it clear that the lineup was not suggestive. Thus, Rice's in-court identification of Howell was based on his opportunity to view the shooter at the scene of the crime, not based on the lineup.

¶41. At the time of the lineup, Howell was under arrest for a parole violation, not for capital murder. The warrant for capital murder had not been issued and proceedings for capital murder charges had not begun. Strictly applying the offense-specific rule, Howell's right to counsel had not attached as to the charge of capital murder. As to capital murder, "the adverse positions of government and defendant" had not been solidified. *See McNeil*, 501 U.S. at 171. An initial appearance pertaining to capital murder could not have been held because there was no charge on which to hold one. *See Page*, 495 So. 2d at 439 ("If it has not already attached, the right to counsel is surely available to the accused at the time the Initial Appearance . . . *ought to have been held*[.]"). The indictment had not been issued, Howell had not been charged, and he had not been told he was being charged with capital murder when the lineup was held. Therefore, we hold that Howell's right to counsel had not attached for that offense. Further, in cases in which the defendant was identified in a lineup – even after the warrant had been issued and the right to counsel had definitively attached – the Court has found harmless error where the witness's in-court identification was reliable based their opportunity to view the defendant at the time of the crime, rather than being based on seeing the defendant in the lineup. *See Lattimore*, 958 So. 2d at 198 (¶ 13); *Jimpson*, 532

24

So. 2d at 989. *See also* **Brooks**, 903 So. 2d at 697 (¶ 15) (harmless error, but combined with other errors, reversal was warranted).

¶42. The **Howell I** Court applied the **Biggers** factors and held that, "[u]nder the totality of the circumstances, there is no likelihood whatsoever, that Rice's identification was not reliable." **Howell I**, 860 So. 2d at 730-31 (¶¶ 89-92) (discussing **Neil v. Biggers**, 409 U.S. 188, 199 (1972)). The Court affirmed that holding in **Howell II**. **Howell II**, 989 So. 2d at 380-81 (¶¶ 21-24). It is evident from the testimony of the officers involved and the Court's evaluation of the lineup in **Howell I** and **Howell II** that the lineup was not suggestive. The trial judge was convinced that Rice's identification was reliable and was based on his ability to view the shooter at the time of the crime. Howell was not under arrest for capital murder at the time of the lineup, and he was not entitled to counsel at the pre-indictment lineup. Regardless, even if there was error, it was harmless because Rice's in-court identification of Howell was based on his opportunity to view Howell at the time of the crime, not based on the lineup.

**V. Whether the failure of Howell's trial counsel to investigate whether Howell was represented by counsel at the lineup amounted to ineffective assistance of counsel.**

¶43. Howell's final issue related to lack of representation at the lineup is that his trial counsel's failure to investigate whether counsel was present at the lineup deprived him of fundamental rights, injected false testimony into the trial, and ultimately amounted to ineffective assistance of counsel. The State maintains that, because the lineup was not suggestive, there is no merit to the claim. The trial court held that Howell failed to meet the

standard for ineffective assistance of counsel set forth in ***Strickland v. Washington***, 466 U.S. 668 (1984).

¶44.   Before trial, Howell filed a motion to suppress the pretrial identification made by Rice and any subsequent in-court identification.  Howell asserted that the lineup was "improper and suggestive" and that he was not represented by counsel at the lineup even though counsel was available and there were no exigent circumstances that required a line-up in violation of his right to counsel and his right to due process of law.  At a hearing on the motion, Chief Grisham testified that local attorney Regan Russell represented Howell at the lineup.  Howell claims that his trial counsel "made no effort to confirm" that Russell had represented him at the lineup.  Russell later unequivocally testified that, although he met with Howell briefly and represented him at an initial appearance, he was not present at the lineup.

¶45.   At the evidentiary hearing, Chief Grisham testified that he still believed Russell was at the lineup.  Chief Grisham said that he saw Howell conferring with Russell on the day of the lineup, he knew Russell was in the building that day, court documents indicate that Russell represented Howell at the arraignment, and he believed Russell was at the lineup.  However, Chief Grisham signed an affidavit in 2007 saying that Tom McDonough, a public defender, was present at the lineup on Howell's behalf.  Grisham testified that, at some point after the trial, Russell told him that he was "in and out" that day, but "he did not remember being at the lineup."  Grisham thought that McDonough could have been there, or that he could have been the attorney conferring with Howell on the day of the lineup if it was not Russell.  McDonough has since testified that he did not represent Howell at the lineup or in any capacity.  Chief Grisham testified that he could have been mistaken, but he would not

have lied intentionally about Howell being represented. He thought an attorney was present at the lineup, but he could not be 100 percent sure. Grisham was in the hallway with the individuals who were part of the lineup; he was not in the room with Rice and Investigator Kent during the lineup.

¶46. In Howell's PCR, he presented the Court with affidavits from Russell and McDonough stating that neither had represented to him at the lineup. The Court granted Howell's PCR on the issue of whether Howell's counsel was ineffective for failing to investigate whether counsel was present at the lineup, writing:

> In light of the affidavits from Russell and McDonough, we are unable to find that Howell's attorney was not ineffective in his representation through the suppression hearing. Rice's identification of Howell was obviously crucial to the State's case. Minimal efforts on the part of trial counsel could have confirmed Russell's presence or non-presence at the lineup. We thus find these issues to have merit, and an evidentiary hearing is required on these combined issues of whether Howell's attorney was ineffective at the lineup stage.

*Howell II*, 989 So. 2d at 395-96 (¶ 86). Howell cites the above-quoted paragraph and asserts that if counsel was not present, which has been determined, then "the parameters of this Court's opinion . . . mandate that Howell receive post-conviction relief on this issue." Howell claims that the trial court should not have applied a harmless error analysis but, regardless, because the lineup identification was crucial to the State's case, Howell maintains that introduction of the lineup identification could not have been harmless.

¶47. The State asserts that the "only reason to have an attorney present during a lineup would be to minimize the possibility of a suggestive array and to preserve the ability to challenge a tainted identification." Because the Court has held that the lineup was not suggestive, the failure to have an attorney at the lineup was harmless error. Consequently,

27

if the error was harmless, the State maintains that "there can be no *Strickland* prejudice arising from any failure to investigate whether counsel was present during the lineup."

¶48. To prove that his trial counsel was so ineffective that reversal of his conviction is required, Howell must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first prong, to prove that counsel's performance was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* If the defendant fails to prove either prong, the proceedings end. *Carter v. State*, 775 So. 2d 91, 93 (¶ 10) (Miss. 1999) (quoting *Foster v. State*, 687 So. 2d 1124, 1130 (Miss. 1996)).

¶49. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Brown v. State*, 798 So. 2d 481, 493 (¶ 14) (Miss. 2001) (quoting *Strickland*, 466 U.S. at 686). We have held as follows:

> In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial. "Judicial scrutiny of counsel's performance [is] highly deferential." There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that but for the

28

attorney's errors, the outcome of the trial would have been different, will we find that counsel's performance was deficient.

*Williams v. State*, 73 So. 3d 1125, 1129 (¶ 12) (Miss. 2011) (quoting *Parker v. State*, 30 So. 3d 1222, 1233 (¶37) (Miss. 2010) (quoting *Holly v. State*, 716 So. 2d 979, 989 (¶ 37) (Miss. 1998) (internal citations omitted)).

¶50. In *Strickland*, the Supreme Court emphasized that counsel is held to "an objective standard of reasonableness" and a court's inquiry into counsel's performance "must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Regarding counsel's duty to investigate, the *Strickland* Court wrote:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. *See also* *Carter v. State*, 775 So. 2d 91, 93-94 (Miss. 1999). The Court has held the following regarding counsel's duty to investigate:

> There is no constitutional right to errorless counsel. *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant only has right to have competent counsel); *Cabello v. State*, 524 So. 2d 313, 315 (Miss. 1988)[.] [F]urther, this Court has held that
>
> > [t]he duty to investigate and prepare is not limitless and not every breach means that counsel has failed to render reasonably effective assistance. "Counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980).

29

*Brown v. State*, 798 So. 2d 481, 497 (Miss. 2001).

*Thorson v. State*, 994 So. 2d 707, 719 (¶ 31) (Miss. 2007). "[T]here is a presumption that trial counsel is competent and that counsel's conduct is reasonable." *Carter*, 775 So. 2d at 94 (¶ 12) (citing *Lindsay v. State*, 720 So. 2d 182, 184 (Miss. 1998)).

¶51.    Looking at the totality of circumstances, Howell's trial counsel's performance was "within the wide range of reasonable professional assistance." Counsel moved to have the lineup identification excluded, there was a hearing, testimony at the hearing indicated that counsel was present at the lineup, and the trial judge denied the motion. Certainly, counsel could have investigated further, but there was no reason for him to believe that Chief Grisham was wrong, and counsel's decision to take Chief Grisham's testimony at face value was reasonable. Because we conclude that counsel's conduct was reasonable, we need not analyze the second prong of the *Strickland* test.

### VI.    Whether the trial court erred by allowing Attorney General Jim Hood to participate in the evidentiary hearing.

¶52.    Attorney General Jim Hood was the district attorney who prosecuted Howell in 2001. Howell claimed that Hood had information related to two issues at the evidentiary hearing – Pannell's alleged exculpatory information and whether counsel was present at the lineup – and Howell subpoenaed Hood as a witness. Instead, Hood showed up to participate as an attorney at the hearing. Howell claims that the trial court erroneously allowed Hood to participate in the evidentiary hearing because he could have been called as a witness. He also takes issue with Hood's conduct during the hearing.

### A. Hood as Attorney and Witness

30

¶53. At the beginning of the hearing, the rule was invoked that witnesses must remain outside the courtroom. Howell's counsel asked the court to exclude Hood from the courtroom because he was "a material witness." Howell claimed that, during the trial, a district attorney intimidated Pannell and did not let her testify. Although it is not clear which attorney Pannell spoke to during the trial, Howell claims it was Hood. Even if it was not Hood, Howell claims Hood had knowledge of it. Howell also claims that Hood knew that counsel was not present at the lineup and that he failed to disclose that information. Naturally, Hood objected to being excluded from the courtroom and to being called as a witness. Hood called it a "fishing expedition" and argued that excluding the lead prosecutor from the courtroom was inappropriate. The judge denied the request to exclude Hood and allowed him to participate in the hearing.

¶54. Howell claims that Hood's participation in the hearing was a violation of Rule 3.7 of the Mississippi Rules of Professional Conduct, which provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness." Miss. R. Prof'l Conduct 3.7(a). Howell argues that allowing an attorney to act as both a witness and advocate is unfair and prejudicial. Howell relies on *Jenkins v. State*, 136 So. 2d 580 (Miss. 1962), *Turner v. State*, 55 So. 2d 228 (Miss. 1951), and *Adams v. State*, 30 So. 2d 593 (Miss. 1947), which stand for the rule that attorneys should not be allowed to act as both witness and advocate.[4] However, Hood was not actually called to testify at the hearing.

---

[4] "Although a prosecuting attorney is competent to testify, his testifying is not approved by the courts except where it is made necessary by the circumstances of the case, and, if he knows before the trial that he will be a necessary witness, he should withdraw and have other counsel prosecute the case." *Adams v. State*, 202 Miss. 68, 30 So. 2d 593, 598

31

¶55. The State responds that there was no error, primarily because the attorney general was not called to testify. In the alternative, if the Court finds error in the trial court's failure to disqualify the attorney general, the State submits that such error was harmless because Howell failed to articulate what prejudice he suffered. Regarding the standard of review for a trial court's decision on a motion to disqualify an attorney, this Court has held that "manifest error applies only to review of findings of fact and that the court has broad discretion." *Byrd v. Bowie*, 933 So. 2d 899, 906 (¶ 25) (Miss. 2006) (quoting *Colson v. Johnson*, 764 So. 2d 438, 439 (¶ 4) (Miss. 2000)). *See also Adams*, 30 So. 2d at 598 ("The propriety of allowing the prosecutor to testify is a matter largely within the trial court's discretion.").

¶56. Howell claimed that Hood had information related to two issues. Regarding his alleged conversation with Pannell during the trial, in her affidavit, Pannell claimed that she spoke with the district attorney about her testimony and he sent her home. However, when questioned at the hearing, Pannell said she had no idea who she spoke with during the trial. Regarding whether Howell had counsel at the lineup, multiple witnesses were questioned extensively, and it is unclear what Hood would have offered in addition. At the time of the trial, everyone was operating under the belief that Howell had counsel at the lineup based on the police chief's testimony. Howell did not offer any proof that Hood had knowledge

---

(1947) (internal citations omitted). *See also Jenkins v. State ex rel. Sweat*, 242 Miss. 646, 136 So. 2d 580, 582 (1962) ("to permit the county attorney to act as advocate for the State and testify as a prosecuting witness constitutes reversible error"); *Turner v. State*, 212 Miss. 590, 55 So. 2d 228, 230 (1951) ("error for the district attorney to testify in this case against the appellant over objection").

otherwise. The trial court's denial of Howell's request to exclude Hood did not amount to abuse of discretion. Further, since Hood was not called to testify, there was no actual error.

### B. Hood's Behavior During the Evidentiary Hearing

¶57. Howell asserts that, during the evidentiary hearing, Hood tried to intimidate his lead attorney by threatening him with subornation of perjury and telling him that he "should lawyer up." Howell moved for a new trial at that point, and the court denied the motion. Howell also claims that, on the third day of the evidentiary hearing, Hood tried to intimidate Pannell again in an attempt to get her to change her testimony. Allegedly, Hood called Pannell into a witness room and asked, "Do you know the penalty for perjury? You have another opportunity to tell the truth." Hood also allegedly told Pannell that she had failed a polygraph test. Pannell maintained that she had told the truth. When Howell's counsel raised the issue with the judge, Hood said he did not intend to call Pannell as a witness,[5] and the judge ruled that the matter was closed. Howell claims that Hood's "unethical behavior during the hearing" deprived him of a fair hearing and of the opportunity to present his evidence.

¶58. The State simply retorts that it was Howell's attorney, not Hood, who "resorted to shenanigans." The State goes on to discuss in detail how one of Howell's attorneys paid Brandon Shaw, a witness, twenty dollars after speaking with him for several hours while he was at work one day. The State attempts to shift the attention to Howell's attorney, but that

---

[5] Howell had called Pannell during his case; she was questioned by Howell and cross-examined by the State. The State originally said it would call Pannell again during its case, but ultimately did not do so.

33

attorney's behavior is not at issue. The State does not otherwise address Howell's allegations about Hood's behavior except to say that the record does not support the claims.

¶59. Howell frames the issue as the trial court denying his repeated requests to remove Hood from the courtroom, but that request was made only once at the beginning of trial. As to Hood's comments to Pannell, Howell did not actually move to have Hood removed from the courtroom; he simply informed the court of the situation. The court found that the issue was resolved because the State did not intend to call Pannell again during its case in chief. We conclude that no error occurred because Howell did not actually enter a motion regarding Hood's comments to Pannell; he did not make a request upon which the court could have acted. Further, the trial court correctly determined that the issue was moot because the State did not intend to put Pannell back on the stand.

¶60. When Hood threatened Howell's attorney with subornation of perjury, Howell moved for a new trial. "Trial courts are allowed considerable discretion to determine whether or not the conduct of an attorney in argument is so prejudicial that an objection should be sustained or a new trial granted." *Henton v. State*, 752 So. 2d 406, 409 (¶ 10) (Miss. 1999) (quoting *Harvey v. State*, 666 So. 2d 798, 801 (Miss. 1995)). *See also Jones v. State*, 857 So. 2d 740, 744-45 (Miss. 2003); *Johnson v. State*, 596 So. 2d 865, 869 (Miss. 1992). The listed cases pertain to statements made by attorneys in front of the jury during trial, the issue being whether improper arguments were prejudicial and unfairly influenced the jury. Such was not the case here. Hood's conduct is not appropriate grounds for a new trial, and the trial judge did not abuse his discretion in denying the motion for new trial based on Hood's comments to Howell's attorney.

## VII. Whether the trial judge erred by denying Howell's motion to supplement the record with Lasonja Gambles's affidavit.

¶61. Lasonja Gambles, a Mississippi native who had moved to South Carolina, read about Howell's evidentiary hearing on the Tupelo Daily Journal's Facebook page, and she came forward claiming to have information about Howell's whereabouts the night/morning of the murder. Gambles was interviewed and submitted an affidavit. She claims that she picked up Howell in New Albany and drove him home to Blue Mountain in the early morning hours, prior to the time Pernell was shot. Gambles's mother was interviewed as well, and her statement corroborates Gambles's story. Howell claims that Gambles is the woman he claimed to be with on the night of the murder, but he previously could not remember her name.

¶62. After Gambles came forward, Howell filed a motion to supplement the record with her affidavit or, in the alternative, to reopen the evidentiary hearing to consider the new evidence. The trial judge denied the motion to supplement for lack of jurisdiction, holding that the Supreme Court had appointed him as special judge to consider only the specific issues set forth in the Court's opinion on Howell's PCR. Howell asserts that the newly discovered evidence is material to his case because it corroborates his alibi. He also claims that "there is reason to believe that the New Albany Police Department prevented Howell from discovering Gambles's identity and statements." He claims that the trial court had jurisdiction and should have granted his motion to supplement the record and that he is entitled to a new trial based on newly discovered evidence. The State maintains that the trial court correctly denied Howell's motion to supplement because it did not have jurisdiction

to address any issues outside those identified in the grant of leave to proceed. *See Davis v. State*, 897 So. 2d 960, 970-71 (Miss. 2004).

¶63.    In *Davis v. State*, the Court remanded for a hearing on five issues, thereby limiting the "scope of the trial court's proceedings" to the five issues. *Id.* at 970 (¶ 34). Davis tried to raise additional issues before the trial court, and we held that the trial judge did not err in declining to address the additional claims because the "trial court had no jurisdiction to address any claims outside those specifically addressed in this Court's remand order." *Id.* at 971 (¶ 34). Likewise, in *Burns v. State*, the Court held that the trial court did not err in denying Burns's motion for a psychologist expert, because the motion was "outside the scope on remand" where the Court had granted Burns's PCR on the limited issue of "ineffective assistance of counsel during the sentencing phase." *Burns v. State*, 879 So. 2d 1000, 1003 (¶¶ 7-12) (Miss. 2004). The *Burns* Court wrote that "[t]his Court has held on several occasions that the only issues properly considered are those issues for which the case was initially remanded." *Id.* at 1003 (¶ 9) (citing *Neal v. State*, 687 So. 2d 1180, 1182 (Miss. 1996); *Billiot v. State*, 655 So. 2d 1, 17 (Miss. 1995); *Culberson v. State*, 456 So. 2d 697, 698 (Miss. 1984)). The trial judge did not err in denying Howell's motion to supplement the record with the newly discovered evidence, which was not germane to the issues specified by the *Howell II* Court.

## Conclusion

¶64.    Howell's claims regarding Rice's recanted testimony and Pannell's statements are without merit, and the trial court did not err in denying Howell's motion for a new trial. Howell was not under arrest for capital murder at the time of the lineup, and he was not

36

entitled to counsel at the pre-indictment lineup. Regardless, even if Howell had been entitled to counsel, the failure to provide counsel during the lineup would have been harmless error because the lineup was not suggestive, and Rice's identification was reliable. Howell's claims about Attorney General Hood lack merit, and the trial court did not err in allowing him to participate in the hearing. Finally, the trial judge did not err in denying Howell's motion to supplement the record with new evidence after the evidentiary hearing. The trial court's denial of Howell's motion for new trial is affirmed.

¶65. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, AND KING, JJ., CONCUR. CHANDLER, J., NOT PARTICIPATING.**